# Exhibit 15

JAN 12 2000

State of Alaska, Department of Education )
Division of Vocational Rehabilitation )
)
Complainant )
)
v. )
)
United States Department of the Army )
Respondent )
)
)

OPINION AND AWARD OF ARBITRATORS

CASE NO. RS/97/2

**Facts:**

On July 16, 1996, Stan Ridgeway, Deputy Director of Alaska's Department of Education's Division of Vocational Rehabilitation, the agency responsible for licensing Alaska's blind vendors under the Randolph-Sheppard Act wrote to Tom Kramer, Director of Contracting at Fort Richardson Alaska expressing interest in bidding on a food service contract at Fort Richardson, which he believed to be within the priority provisions of the Randolph-Sheppard Act.

The Army issued no response to the State's request regarding the contract and instead (with no notification to the State) pursued the listing of the contract under the Javits-Wagner-O'Day (JWOD) Act. This listing resulted in the publication of the contract on the JWOD procurement issued in October 1996. This listing was made over the objection of Frederic Schroeder, Commissioner of the Rehabilitative Services Administration of the U.S. Department of Education which is the federal agency charged with oversight and administration of the Randolph-Sheppard Act. The Army executed a contract with the sole JWOD program contractor listed for the State of Alaska, on November 25, 1996.

Upon learning of the award of the contract, the State of Alaska notified Mr. Kramer, the Director of Contracting at Fort Richardson of their intent to appeal his decision but was told that the time for appeal had run despite the failure of the Army to notify the State of the contracting process, and that the contract award was final. Following the Army's denial of this appeal request, the State contacted the U.S. Department of Education and this arbitration proceeding was initiated. (Statement of Facts – State of Alaska Pre-hearing Brief pp. 1-2).

The complainant, the State of Alaska Division of Vocational Rehabilitation requested that the arbitration panel grant them the following relief:

1. The State licensing agency be awarded the dining facility contract at the Fort Richardson installation in the future and be compensated for the lost revenue during the time that the contract is operated by another contractor. (The State of Alaska abandoned its claim for damages prior to the hearing.)

2. The State Licensing Agency be notified of future dining facility contracts (letter from Frederick K. Schroeder, Commissioner, United States Department of Education Office of Special Education and Rehabilitation Services to Mr. Tom Kramer, Director of Contracting U.S. Department of Defense.)

The Department of Education pursuant to the request of the State of Alaska and in accordance with its authority under Randolph-Sheppard Act Sections 5(b) and 6 "Policies and Procedures for Covening and Conducting an Arbitration" selected three persons to be panel members, Mr. Joseph Luman, Mr. Robert R. Humphreys and Mr. T. W. Patch, as Panel Chairman.

A hearing was conducted, which included the presentation of documentary evidence, the testimony of witnesses, and the presentation respectively of the agency's case by Philip A.

Reeves, Esq. for the State of Alaska and Col. Arthur Larry Passar, Esq. for the Department of Defense, took place on February 11 and February 12, 1998 in Anchorage Alaska.

Post hearing briefs were submitted to the arbitrators. Arbitrators Luman and Humphreys submitted awards in the case. However, Arbitrator Patch did not submit his award. After considerable time had elapsed without the submission of an award by Arbitrator Patch it was decided by the parties to replace Mr. Patch, with another arbitrator. On August 30, 1999, Dr. Richard Trotter was informed of his selection as Panel Chairman in the above entitled case. The parties determined that it was not necessary to hold another hearing on the matter, but that the newly appointed Arbitrator would render an opinion based on the proceedings and submissions which had already taken place.

On October 1, 1999, Arbitrator Trotter, Chair of the Arbitration panel, submitted to Arbitrator's Humphreys and Luman his draft of the award in the case. Upon receipt of the award, Arbitrator Humphreys requested a meeting of the panel which took place on November 1, 1999. At that meeting, Arbitrator Humphreys stated his reasons for believing that the Army had improperly awarded the contract to the National Industries for the Severely Disabled under the Javits-Wagner-O'Day Act. At that meeting he submitted a letter from Frederick R. Schroeder, Commissioner Rehabilitation Services Administration of the Department of Education dated January 27, 1999 which rescinded a March 3, 1992 interpretation of the Randolph-Sheppard Act by Commissioner Carney. Arbitrators Humphreys and Luman were requested to submit their proposed drafts of the award in the above entitled case. Arbitrator Luman also submitted subsequently to Arbitrator Trotter for his consideration a decision rendered in Case No. RS/97-18 which involved an interpretation of whether the Randolph-Sheppard Act 20 USC section

107d-3 ("R-S Act" is applicable to appropriated fund contacts covering military dining facilities which are basically used by military personnel.

## Applicable Statutes and Regulations

## The Randolph-Sheppard Act (20 USC.107(s)) and the Javits-Wagner O'Day Act (41USC.48)

The Randolph-Sheppard Act was enacted in 1936 and amended in 1974. The purpose of the Act was to provide self-employment opportunities for and promote the economic self-sufficiency of blind persons. The primary means through which the Act accomplishes this goal is by giving licensed blind vendors a priority for the operation of vending facilities on Federal property. Specifically, the Act provides that "in authorizing the operation of vending facilities on Federal property priority shall be given to blind persons licensed by a State agency" (20USC107(b)). "Vending facility" is defined by the act to mean "automatic vending machines, cafeterias, snack bars, cart services, shelters, counters and such other appropriate auxiliary equipment as the secretary may be regulation prescribe as being necessary" (20 USC. 107(b)).

In addition, the Act directs the Secretary of Education to:

> Prescribe regulations . . . which establish a priority for the operation of cafeterias on Federal property by blind licensees when he/she determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided to employees, whether by contract or otherwise. (20USC.104d-3(e))

In conformity with its charge to administer the Randolph-Sheppard program, the Department of Education has promulgated regulations 34 CFR Part 395 under which the Randolph-Sheppard program is administered. Those regulations define a cafeteria as:

> A food dispensing facility capable of providing a broad variety of prepared foods and beverages (including hot meals) primarily through use of a line where the customer serves himself from displayed selections. A cafeteria may be fully automatic or some limited waiter or waitress service may be available and provided when a cafeteria and table or both seating facilities are always provided. (34 CFR. Section 395 (d))

**<u>The Javits-Wagner-O'Day Act (41 USC. 48)</u>**

The Javits-Wagner-O'Day Act requires the Government to purchase certain supplies and services from nonprofit agencies such as National Industries for the Severely Handicapped (NISH). The Committee for Purchase from People who are Blind or Severely Disabled, an independent government organization, determines and maintains a list of the supplies and services to be purchased from NISH. The Committee also establishes prices for the NISH supplies and services. Federal agencies which intend to procure any of the commodities or services found in this list:

> Shall, in accordance with rules and regulations of the Committee, procure such commodity or service, at a price established by the Committee, from a qualified non-profit agency for the blind or such an agency for the severely handicapped if the commodity or service is available within the period required by that government entity (41 USC. 48).

One area of potential conflict between the priorities established by these two acts concerns the performance of services pertaining to the "operation of a cafeteria" on Federal property and provided by a government agency.

**<u>Position of the State of Alaska, Department of Education, Division of Vocational Rehabilitation Regarding the Award of the Fort Richardson Contract to NISH</u>**

The State of Alaska identifies three issues that should be addressed by the Arbitration panel.

Issue 1

Is the Ft. Richardson dining facility which is the subject of this arbitration a "cafeteria" under the definitions set out by the Randolph-Sheppard Act 34 CFR Part 395? (Pre-hearing Brief State of Alaska, p. 3)

Issue 2

> Given that the Ft. Richardson dining facility is a "cafeteria" does the "mess attendant" contract which is at issue in the arbitration fall within the scope of the Randolph-Sheppard Act as "cafeteria operation" such that the requirements 34 CFR Section 39533 apply to the Army's contracting process? (Pre-hearing Brief State of Alaska, p. 6)

As the State of Alaska set out in its Pre-hearing Brief, in the factual context of this arbitration, the issue can be more narrowly defined as:

> In a case where a federal agency (here the Army) chooses to divide the operations of a Randolph-Sheppard "cafeteria" into two operational pieces and to retain one of those contracts "in house" does the remaining operational piece thereby lose its Randolph-Sheppard vendor priority such that the Army may deny blind vendors the opportunity to submit competitive proposals bids for that contract piece? (Pre-hearing Brief State of Alaska, p. 6)

Addressing the first issue the State of Alaska takes the position that military dining facilities are "cafeterias" covered by the Randolph-Sheppard Act. In support of its position of this issue the State of Alaska cites a memorandum issued on August 14, 1997 by Frederic Schroeder, Commissioner of the RSA which discusses the mess hall issue and reinforces the longstanding interpretation that the plain language of the Randolph-Sheppard Act and its implementing regulations provide no exception for military mess halls from the definition of "cafeteria." (Commissioner, Rehabilitation Services Administration, Department of Education memorandum of August 14, 1997 to Committee for the Purchase from the Blind and Other Severely Handicapped). Additionally the State of Alaska cites a Comptroller General's decision which

considered the same issue of Randolph-Sheppard Act application to military mess halls at the request of the Air Force and the small Business Administration. That decision the State of Alaska asserts, held that military mess halls are not excluded from the reach of the Randolph-Sheppard Act priority provisions. (Department of the Air Force – Reconsideration 72. Comp. Gen. 241 (1993))

Given that military mess halls have been held to be cafeterias within the scope of the Randolph-Sheppard Act, the State of Alaska further argues that given that the Fort Richardson Troop Dining Facility is a "cafeteria" under the definitions of the Randolph-Sheppard Act and its regulations it follows, the State asserts that if the entire dining facility were contracted out, then the Army would be required to give priority to a proposal submitted by a Randolph-Sheppard contractor.

The State of Alaska further asserts that the express terms of the "mess attendant" contract which the Army has entered into with its JWOD contractor can not be characterized as anything but cafeteria service duties, if they were part of a full food service contract.

The State of Alaska further asserts that the essential issue in this case is whether these mess attendant duties without which the cafeteria can not be operated, have lost their "cafeteria operations" character through the Army's retention of other cafeteria operations "in-house." Further the State of Alaska asserts that neither the Army's "in-house" portion of the cafeteria's operations nor the "mess attendant" contract portions of the cafeteria's operations can stand on their own to provide cafeteria services since they are both essential components of a single

operation, thus within the scope of the Randolph-Sheppard priority for blind vendors if contracted out by the Army. The State of Alaska takes the position that dividing the cafeteria operations into two components does not remove the mess attendant functions from the priority provisions of the Randolph-Sheppard Act.

**Position of the Army in Support of the Award of the Fort Richardson Contract to NISH under JWOD**

It is the contention of the Army that one of the issues in this case is jurisdictional, namely whether the Randolph-Sheppard Act applies to the services being performed in the military dining facility at Fort Richardson. The Rehabilitation Services Administration had already in correspondence intended to resolve in principle this very matter that the Randolph-Sheppard Act would be inapplicable in the facts of the situation are as the Army has honestly described them to be in this case – in essence that the Army is operating the facility "in house" with critical food service functions being performed by military personnel and the support services, being of a limited nature.

Additionally the Army asserts, using the terms routinely used for such contracts, the services for which the Army is contracting at Fort Richardson and Dining Facility Attendant services (also known as "kitchen police" or KP services are essentially custodial support services, not "full food services" which would amount to contractor operation of the dining facility. In support of this position the Army asserts that the military personnel engage in those activities which constitute the operation of a cafeteria, such as menu selection, ensuring that an appropriate quantity of food is on hand for each meal, ensuring the overall quality of the meals served,

ensuring adherence to health standards in food storage and preparation, to the actual cooking and serving of the food, maintain the operability of essential cooking equipment, and do all but the most mundane custodial work and a few tasks related to vegetable cleaning paring and chopping. The Randolph-Sheppard Act, the Army asserts, has never been applicable to the functions provided in the mess attendant contract.

The Army also contends that the Randolph-Sheppard Act was not intended to apply at all to the operation of military mess halls, even when contracting for full food services is involved. That is because these mess halls are not vending facilities wherein items are sold to customers who pay with their own funds, and the Act only applies to cafeterias in which such "vending" is conducted. This assertion is justified in the Army's opinion because neither the plain language of the Act nor it's legislative history supports the conclusion that the Act applies to mission-related services acquired with Congressionally appropriated funds. Should this argument not be accepted by the arbitration panel, the Army asserts that the limited services contracted out in this case do not amount to the operation of a cafeteria, thus rendering the Randolph-Sheppard Act inapplicable to this contract.

Addressing the State's demand for compensatory damages, it is the position of the Army that even if the Act were applicable, the State has no right to seek compensatory damages on behalf of the vendor who allegedly is seeking to perform the services in question. Moreover, assuming compensatory damages were theoretically obtainable from a federal agency, under some circumstances covered by the Randolph-Sheppard Act, they are not obtainable in this case because the claim is totally speculative. Contrary to the State's implication that the Army was

bound to negotiate a contract, its licensed vendor a federal agency is not obligated to negotiate only with such a licensee. Rather, the agency's only obligation is to solicit an offer from the licensee in conducting a full and open competition soliciting offers from all interested vendors and must consider awarding the contract to the licensee only if its offer is among the most highly rated offers submitted (that is "in the competitive range" in terms of price) quality and any of the factors specified in the solicitation. Thus, the Army concludes, even if the DoD should have solicited the licensee, no compensation for alleged lost revenue can be awarded. (Respondent Pre-hearing Brief pp. 2-3).

Findings of Fact and Conclusions of Law and Reason

In order to determine what is an appropriate award in this case it is necessary to address how the Randolph-Sheppard Act's priority provisions have been applied to military dining facilities in previous cases.

The Army has maintained that Army dining facilities are procurements with appropriated funds, and are thus not subject to the priority provisions of the Randolph-Sheppard Act.

A Memorandum for General Counsels of the Military Department from Judith H. Miller, Subject Applicability of the Randolph-Sheppard Act to Military Dining Facilities dated November 12, 1998 addresses this issue in the following terms:

> The applicability of the Randolph-Sheppard Act to contracts for the operation of military dining facilities involving appropriated funds has recently been the subject of discussion within the Department of Defense. This memorandum is issued to reiterate this office's opinion on the matter. As discussed it is my opinion that the Act is generally applicable to military dining facilities. This meaning is based upon the plain meaning of the statute, Department of Education Guidance, and Comptroller General opinions (Good Food

> Service Inc. – Reconsideration B – 2565263 Comp. General (July 11, 1994)). The comptroller General noted in this opinion that in a prior decision he determined that the Act was applicable to appropriated fund procurements and stated "we did not distinguish between appropriated and non-appropriated funds in the above decision because the procurement was conducted with appropriated funds. Thus, we are not called upon to discuss the application of the Randolph-Sheppard Act to a procurement not involving the expenditures of appropriated funds" (see Miller Memorandum, footnote p. 2).

In view of the above, the Army's contention that procurements with appropriated funds as exists with military dining facilities exempts them from the priority provisions of the Randolph-Sheppard Act is inconsistent with findings on this issue. The Army has asserted that troop dining facilities are not "cafeterias" within the definition of vending facilities subject to the Act. The November 12, 1998 memorandum cited above addresses this issue in the following terms:

> DoE, the agency charged with administration and enforcement of the Act has determined that generally (emphasis added) military dining facilities are cafeterias and are indeed included within the scope of, and subject to the Act. As recently as Novemt 9, 1998, DoE confirmed the continuing suitability of its position in a letter to the Deparment of the Army. (See Miller Memorandum p. 1)

In view of the above the State of Alaska is correct in asserting that procurements with appropriated funds are equally subject to the priority provisions of the Randolph-Sheppard Act as are procurements with non-appropriated funds. Additionally, it thus seems clear that military dining facilities have been considered to come within the definition of "cafeterias" as defined by Randolph-Sheppard and by administrative interpretations of that Act.

However, not withstanding the above, the facts of this case support the Army's decision to give the mess attendant contract to NISH under JWOD and not to the Randolph Sheppard vendors. The Army's choice of vendors is supported by DoE decisions. While DoE had consistently taken the position that military dining facilities are cafeterias and are generally (emphasis added)

subject to the Act it has recognized that the Act may not be applicable in those instances where the contracts are for discrete services rather than the overall operation of the dining facilities. Former DoE Rehabilitation Services Administration Commissioner Nell C. Carney in a letter to Assistant Secretary of Defense (Force Management and Procurement) Christopher Jehn (pp. 3, 4) supported the Army's position on the inapplicability of Randolph Sheppard to certain situations. In that letter Commissioner Carney stated:

> We have agreed with the Department of the Navy's conclusion that the Randolph-Sheppard Act when read in concert with 32 CFR 2603(g) does not apply in those instances where DoD is operating a cafeteria on an "in house" basis, that is to say, a significant number of DoD employed personnel play an important role in performing those duties integral to the cafeteria's operation could utilize a food service contractor on the Committee's procurement list (JWOD's Committee for Purchase from People who are Blind or Severely Disabled) to perform food services without conflicting with the Randolph-Sheppard Act. No conflict would exist because the Randolph-Sheppard Act's priority for the operation of cafeterias on Federal property does not apply to cafeterias operated by DoD on an in-house basis. However, if a cafeteria at a DoD facility were to use food service contractors on the Committee's procurement list to perform most or all of the duties integral to the cafeteria's operations, then there is a strong potential for conflict with the Randolph-Sheppard Act. Such a cafeteria, given the limited role played by the facility's DoD employees in its operation would not actually involve "in house" operations by DoD. In effect, the DoD facility would have contracted out the operation of the cafeteria to the food service contractor on the Committee's procurement list. This would involve a conflict with the Randolph-Sheppard Act because licensed blind venders have a priority when DoD facilities contract out for the operation of cafeterias.

Commissioner Carney noted that such determinations are fact specific and must be made on a case by case basis. At the time that the Army made its decision to award the Ft. Richardson contract to N.I.S.H. in 1996, Commissioner Carney's interpretation of the statute was the last Rehabilitation Services Administration interpretation of the Randolph-Sheppard Act. On January 27, 1999 Commissioner Schroeder wrote to Beverly L. Milkman, Executive Director Committee for Purchase From People Who are Blind or Severely Disabled informing her that he was rescinding his predecessor's determination that RS priority only applied where military

personnel "played a very limited or no role in the overall functioning of the feeding facility." The outcome of the case under consideration is unchanged because in the opinion of the Arbitrators the activities which were the subject of the Ft. Richardson contract did not constitute the operation of a cafeteria in such a way as to trigger the priority provisions of the Randolph-Sheppard Act. The contract in question was for scrubbing pots and pans, with the only contact with food being the placement of potatoes into the mechanical machine that abraded their skins. These activities in the opinion of the arbitrators do not constitute the operation of a cafeteria because no vending occurred, no concession was involved and there was no entrepreneurial activity of the type contemplated by the Randolph-Sheppard Act.

Additionally, Commissioner Schroeder's letter is worded in such a manner as to indicate that it is not his understanding that his interpretation of the law constitutes a final determination of the unresolved Randolph-Sheppard issues. In that letter he states "based on the foregoing, the Randolph-Sheppard Act is in the process of reexamining the issue of what food services on military bases constitute the operation of a cafeteria under the act."

Commissioner Schroeder's letter recognizes that his interpretation of the Randolph-Sheppard priority issue as applied to military bases depends upon the facts of each case when he ruled that "in the interim, Randolph-Sheppard Act will assess issues that arise on a case by case basis."

Several cases involving military dining hall facilities have arisen concerning the application of the priority provisions of the Randolph-Sheppard Act. One of the most significant is that regarding Kessler AFB which was found to be subject to Randolph-Sheppard by a comptroller

General's decision on June 4, 1993. In that case the Comptroller General held that the military dining halls at Kessler Air Force Base were subject to the Act and dismissed protests by a company seeking the contract under Section 8(a) of the Small Business Act. In that case the Comptroller General held that the Air Force correctly determined that the Randolph-Sheppard Act which affords priority to blind licensees for contracts to operate cafeterias was applicable to a request for full service contracts (emphasis added) at Kessler Air Force Base since the requirement is for providing meals at base dining halls operated essentially as cafeterias and thus is within the scope of cafeteria contracts contemplated by the statute not withstanding that services incidental to cafeteria food services are also required.

In that case, unlike the Ft. Richardson case under consideration, the contract was for a full food service contract encompassing a wide variety of activities of cafeteria operation. In its opinion the Comptroller General stated:

> The requirement is for full food service management, and operation of five dining halls, a central processing kitchen, a flight kitchen, and a central bakery. It also covers menu planning, requisition of food, food preparation and service, cashier services, sanitation housekeeping, grounds maintenance around the dining halls and food service equipment maintenance. (8CGEN 107, 610-114, 734)
>
> The fact that the requirement entails a large scale cafeteria operation rather than operation of a single cafeteria also does not remove it from the definition; there is nothing in the definition (or in the Act itself that excludes such large scale operations from the Act. While a larger cafeteria based food service operation logically would require a larger, perhaps more comprehensive effort in several tasks e.g., operating a central processing kitchen and pastry kitchen to prepare food to be dispensed in the cafeteria, instead of a single kitchen in a single cafeteria – the fundamental nature of the functions being performed does not change; these functions remain directly to providing cafeteria services and as such are covered by the Act (8CGEN107, 610-114, 735).

Since the issuance of the Comptroller General's decision in 1993 other cases have arisen concerning the applicability of Randolph-Sheppard to the awarding of contracts for military

dining facilities. Particularly on point and illustrative of the case by case approach that has been taken on the issue is a recent arbitration case involving Air Force dining facilities at Barksdale Air Force Base. The Arbitrators in that case determined that although the Air Force contracted out certain mess attendant functions it retained the overall "operation" of the dining facility and operated it on an 'in house" basis. Thus, the contract was determined to be not subject to the priority provisions of the Act. (Louisiana Department of Social Services, Rehabilitation Services v. US Department of Defense, Department of Air Force, Case No. R-S/97-3 (1998) (Barron, Hilker, Mayer Arb.) p. 11, 14 quoted in Memorandum for General Counsels of Military Department from Judith H. Miller, dated November 12, 1998, p. 3).

The issue of the appropriateness of applying the Randolph-Sheppard Act to mess attendant services was raised in a claim by the State of Alaska, Department Education Division of Vocational Rehabilitation with respect to a decision by the Air Force to exclude the Barksdale Air Force Base (AFB) mess attendant services solicitation from the Randolph-Sheppard Act. In denying the State of Alaska's protest, the Air Force made the following determinations based on the law.

> The Randolph-Sheppard Act provides that in authorizing the operation of vending faciltities on Federal property, priority shall be given to blind persons licensed by a State agency. 20 USC. Section 107(b), Eielson mess attendant solicitation does not have a requirement to "operate" the mess facility. Eielson AFB, military members will provide all working services for the primary and secondary dining facilities, and the necessary management supervision to operate these facilities. Our requirement is not (emphasis added) for the operation of a full food service facility.

> The Digest of Comptroller General Decision B-250465 states that (the) "Department of the Air Force correctly determined that the Randolph-Sheppard Act, which affords a priority to blind licensees for contracts to operate cafeterias (emphasis added) was applicable to a requirement for full food service (emphasis added) at an Air Force base since the requirement is for providing meals at base dining halls operated essentially as

> cafeterias and therefore is within the scope of cafeteria contracts contemplated by statute, notwithstanding that services incidental to cafeteria food services also are required. Again, our mess attendant solicitation does not require the contract to "operate" our cafeteria, nor provide "full food service."
> As well, both the Department of Defense and Air Force provide clear directives and instruction on RSA application to military mess attendant services. First, Department of Defense Directive 1125.3 paragraph D entitled Policy directs RSA priority on DoD controlled property to the blind "in establishment and operation" (emphasis added) of vending facilities and award of contracts to "operate cafeterias" (emphasis added). Further, Air Force Instruction 34-206, paragraph 1 entitled Program Overview, affirms the Air Force position to be in line with the Department of Defense. (Memorandum for State of Alaska dated July 19, 1996 from 354 Cons LGCV signed Joel T. Lagesse, p. 1). (Army Ex. 35)

A memorandum, dated August 15, 1996, to Stan Ridgeway from Helen Eckman (Army Ex. 36) both of the Division of Vocational Rehabilitation of the State reveals the State of Alaska's awareness of the direction of DoD policy on this issue. In the August 15, 1996 memo, Helen Eckman states:

> I spoke with Mark Hurst this morning. He called to update the situation with the suspension of the solicitation for Eielson AFB. According to Mark, DoD is deciding what to do at Barksdale Louisiana. The option for renewal of their contract is drawing close. DoD knows that if they continue the contract at Barksdale, it would be difficult to deny us the right to bid on a similar contract in Alaska. The Barksdale decision will be precedent-setting for us. In the event the DoD continues to honor their contract at Barksdale, we should be permitted to bid on Eielson. If they won't let us bid, Mark says he will advise us to contest the decision.

A follow up memorandum dated September 24, 1996 to Stan Ridgeway from Helen Eckman states: (Army Ex. 37)

> I spoke with Mark Hurst this morning. He reports that the Air Force has made a decision regarding Barksdale AFB and Eielson AFB, which is not favorable for our chances in obtaining that contract. This will also affect Eimendorf. Mark does not recommend that we press the mess attendant service issues since he is certain that we will not win.

Given the decisions rendered on this issue the determination of what contracts are subject to Randolph-Sheppard Act priority are judged on a case by case basis though certain elements of this issue have been established through precedent-setting decisions.

1. Military dining facilities have been held to be cafeterias, subject to the priority provisions of Randolph-Sheppard.
2. The Act has been held to be applicable to appropriated and non-appropriated funds.
3. The Randolph-Sheppard Act affords blind licenses priority for contracts when two conditions are met:
   a. they must be engaged in the operation of the cafeteria.
   b. The operation of the cafeteria is applicable to the requirement for full food service.
4. The Randolph-Sheppard Act priority is not applicable to the following situations:
   a. Where the contracts are for discrete services rather than the overall "operation" of the dining facilities.
   b. If DoD personnel play an important role in the overall functioning of the cafeteria. DoD is viewed as operating the "cafeteria on an 'in-house'" basis and, as a result, the food service contract would not conflict with the Randolph-Sheppard Act.

In view of the above, the arbitrator concludes that the factual setting of the Ft. Richardson contract clearly was for discrete services and the overall operation of the cafeteria was conducted by Army personnel, thus constituting the operation of the cafeteria on an 'in house" basis. Support for this decision is found in the record of this case.

The Army has contended the following:

> Fort Richardson is a military installation at which operational (TOE) units are stationed. The dining facility at Fort Richardson is run by military personnel assigned to those operational units whose military occupational specialty requires that they maintain the ability to provide subsistence to soldiers in the assigned units so that the units can be self-sustaining if they deploy for war or other military operations.
>
> Consistent with Army regulation, while military food service managers and cooks at this facility for TOE units perform operational management (emphasis added) of the dining facility and all critical tasks related to menu selection, food storage and preparation, safety and quality control (the Army contracts for limited support services since essentially of a custodial or Kitchen Police (KP) nature that is "dining facility attendant" (DFA) services. The work required of the contractor is set forth in Section C of the Contract (the "Statement of Work" or SOW) attached here to TAB 11. As section C provides the contractor is responsible only for menial tasks involving cleaning cooking equipment, dining utensils, and dining areas, and tasks of a similar nature, the only actual support of the provision of food itself being tasks related to the cleaning and cutting of fruits and vegetables. The evidence will show that the contractor in place is only performing such tasks as are prescribed by the contract, the only task involving vegetable preparation being cutting the eyes off machine-peeled potatoes. The contractor has no responsibility for managing the cost of acquiring and preparing the food stuffs served in the facility. Those critical tasks are the responsibility of the Food Service Sergeant (FSS) and his military staff (State of Alaska Complainant, U.S. Department of the Army Respondent, Respondents Pre-hearing Brief p. 5).

Evidence presented by the Army and the lack of contradictory evidence presented by the State of Alaska support the Army's characterization of the services rendered in the mess attendant contract as not constituting the operation of a cafeteria. A letter dated February 4, 1997 from Mark D. Hurst, President of Food Services Inc. of Gainesville, Georgia, to Helen Eckman of the Alaska Department of Vocational Rehabilitation (Army Ex. 38) supports the Army's contention that the services rendered under the contract were not for the operation of a cafeteria, but rather were ancillary services. Mr. Hurst after reviewing the Ft. Richardson Army contract stated "we reviewed the Ft. Richardson Army contract and it has only vegetable preparation in reference to full food service." (Army Ex 38)

In support of its position that activities under Ft. Richardson contract constitute the operation of a cafeteria, the State of Alaska cites the following from the testimony of the Army's food service manager Gary Rosyneck.

> Q: Would you agree that the scope of the work under this NISH contract is an integral part of the operation of that full food service?
>
> A: Oh, absolutely. I mean, if a contractor doesn't ensure that their part of the operation is properly done, the potential to have soldiers sick and, in fact could even kill them – from food borne disease is very significant. (TR Day 2, pp. 108-109)

In response to examination by Mr. Luman, the Army appointed arbitrator, Mr. Rosyneck's discussed some of the technical requirements and training for the scope of work included in the mess attendant contract.

> Q: Okay, so who does the work the contract does, just the GI's?
>
> A: Yes, on the field, yes.
>
> Q: In the field. So, this is the infamous KP.
>
> A: Correct.
>
> Q: And it is not highly specialized work?
>
> A: Oh, they are given special training. There are special regulations on it, yes there is some there is some specifics that have to be done, but they have a – there is a veterinary corps and a medic – a medical corp that does inspections that field KP site (TR Day 2 pp. 137-138).

However, further examination of Mr. Rosyneck supports the Army's contention that the work performed in the Ft. Richardson contract does not constitute the operation of a cafeteria.

> Q: Looking at that contract that is being performed at Fort Richardson does the, do the slots in that contract train people – to what degree do the people performing there, including managers, qualify as material for cafeteria managers if you were going to hire one?
>
> Q: Yes. How good of a vehicle is that for training a potential cafeteria manager?

> A: Oh, it has nothing to do with running a cafeteria, KP portion of this.
>
> Q: If I were the top person, the supervisor on this contract for two years, what qualif – (sic) would I be able to operate a cafeteria?
>
> A: Not all all.
>
> But, when you are talking about the contract and doing the scope of this contract, there is absolutely no way you could do this and then go run a cafeteria and be a manager of a cafeteria. The two don't have anything to do with each other. (Tr. Day 2, p. 139)

In his closing arguments Colonel Passar makes what I believe to be a relevant observation concerning the relationship between the operation of a cafeteria and the mess attendant contract which is the subject of this case. He states:

> In fact, the contrary was the intent of the Army here with its initiating the program under NISH to get its services done. I omitted to mention when we talked about the Act not saying food services and essential support services. I will give you this following example:
>
>> You know, a doctor does not sterilize surgical instruments but sterile instruments are critical to what the doctor does and what the hospital does. This does not elevate sterilization of instruments to the level of operating the hospital. (TR Day 2, p. 149)
>
> The statute talks about operating a cafeteria and, even if these mess halls were construed to be cafeterias within the meaning of the Act, what is going on in this dining facility is not operating the facility as I trust was clearly evident to the folks from the testimony and from the site visit (TR Day 2, p. 149).

The issues raised by the State of Alaska in its pre-hearing and closing brief included the following.

**Issue 1**

Is the Fort Richardson dining facility which is the subject of this arbitration a "cafeteria" under the definition set out by the Randolph-Sheppard Act (34 CFR Pat 395)?

The Arbitrator finds the Fort Richardson dining facility is a "cafeteria" for purposes of the definition of the term cafeteria set forth by the Randolph-Sheppard Act. The Army's distinction between appropriated and non-appropriated funds has been rejected in Good-Food Services Inc. Reconsideration (B-2565263). Additionally the Army's position that most of the food is in kind as part of a soldier's pay and thus eliminates the Ft. Richardson facility from the definition of a cafeteria since no vending is taking place is not supported by the evidence since the State of Alaska did establish that 25% or more of the patrons were paying customers (Tr. Day 2, Page 120)

Issue 2

Given that the Ft. Richardson dining facility is a "cafeteria", does the mess attendant contract which is at issue in this arbitration fall within the scope of the Randolph Sheppard Act as the "operation of a cafeteria" such that the requirements 34 CFR Section 395.33 apply to the Army's contracting process?

It is the opinion of the Arbitrator that the "mess attendant" contract which is an issue in this arbitration does not constitute the operation of the cafeteria to satisfy the requirements of the Randolph-Sheppard Act. For the reasons set forth earlier in this opinion the Fort Richardson's dining facility is an "in house" operation with discrete mess attendant functions performed under the contract.

In its closing brief the State of Alaska states as a corollary to Issue 2 that:

> In a case where a federal agency (here) the Army chooses to divide the opeations of a Randolph-Sheppard "cafeteria" into two operational pieces and to retain one of these

> pieces "in house" does the remaining operational piece thereby lose its Randolph-Sheppard blind vendor priority such that the Army may deny competitive blind vendors the opportunity to submit proposals/bids for that contract piece? (Pre-Hearing Brief State of Alaska, p. 6).

In it's brief the State of Alaska asserts "that this is the core issue of this arbitration and to our knowledge is a case of first impression for Randolph-Sheppard proceedings." (Closing Brief – State of Alaska, p. 1). As stated earlier in this opinion several cases have addressed this issue. Especially on point is the case pertaining to the Air Force dining facilities at Barksdale Air Force Base. As cited previously, Nell Carney, the Commissioner, Rehabilitation Services Administration Department of Education in an undated letter to the Assistant Secretary of Defense (Force Management and Procurement) addressed this specific issue and held that if a military dining facility is operated 'in house", or it chooses to contract mess attendant functions awarding such to a contractor other than a Randolph-Sheppard contractor, the award of the contract does not conflict with the priority provisions of the Randolph-Sheppard Act for blind vendors. (pp. 3, 4)

The State appears to be correct in saying that if the contract in question were a <u>full food service contract</u>, the mess attendant services, if part of the overall operation of the cafeteria would be subject to Randolph-Sheppard Act priority provisions. This is supported by <u>the Comptroller General's</u> decision in the <u>Kessler</u> case (8 <u>Comp. Gen.</u> 107, 610-114, 733). However, in this case the contract in question is not a <u>full food service</u> contract and squarely falls into the "in house" mess attendant contracting out category of the Barksdale Air Force Base case and thus is not subject to the priority provisions of the Randolph-Sheppard Act.

Procedural Issues

The State of Alaska has argued that they were denied procedural due process because the Army – the Ft. Richardson contractor did not inform the State of Alaska of the proposed bid by NISH and proceeded to give NISH the contract. Nothing in the record supports the State of Alaska's position that the Army was specifically required to notify the State Division of Rehabilitation of their consideration of NISH for the contract. In fact the evidence is clear that the Ft. Richardson contract was never a full food service contract, and in fact the State's request to bid on the contract was made erroneously. This is supported by the following: In a memorandum letter dated August 15, 1996 from Helen Eckman to Stan Ridgeway she stated "you may already be aware that Eimendorf is also a KP contract. Full food service contracts will be available at Ft. Richardson (emphasis added), Ft. Wainwright, Ft. Greenly and Kodiak (Army Ex. 36`

This State's misperception of scope of the Ft. Richardson contract was reiterated in a memo dated September 24, 1996 to Stan Ridgeway from Helen Eckman. In that memo she states "the good news is that the Army bases, Ft. Wainwright, Ft. Greenly and Ft. Richardson (emphasis added) are all full food service."

Since the Army was not contracting out work under the priority provisions of the Randolph-Sheppard Act no statutory rights were violated because the Army did not notify the State of Alaska's Division of Rehabilitation of its intent to give NISH the mess attendant contract.

Award

The petition of the State of Alaska, Department of Education, Division of Vocational Rehabilitation requesting that the State Licensing Agency be awarded the dining facility contract at the Fort Richardson installation in the future is denied for the reasons set forth above.

DATED: January 6, ~~1999~~ 2000

Robert R. Humphreys, Arbitrator

Joseph C. Luman, Arbitrator

Richard G. Trotter, Arbitrator