# In the United States Court of Federal Claims

No. 06-666C
Filed November 30, 2006

|  |  |  |
|---|---|---|
| COLORADO DEPARTMENT OF HUMAN SERVICES, DIVISION OF VOCATIONAL REHABILITATION, *et al.*, | ) ) ) ) ) | Randolph-Sheppard Act, blind vendor, jurisdiction, arbitration, exhaustion of administrative remedies, preliminary injunction |
| v.           Plaintiffs, | ) ) |  |
| THE UNITED STATES, | ) ) |  |
|           Defendant. | ) ) |  |

   Andrew David Freeman, Brown, Goldstein & Levy, LLP, Baltimore, Maryland, for plaintiff, Colorado Department of Human Services, Division of Vocational Rehabilitation. Kathryne Gwinn, Colorado Department of Human Services, Denver, Colorado, of counsel.

   Andrew David Freeman, Brown, Goldstein & Levy, LLP, Baltimore, Maryland, for plaintiff, Steven Rightsell.

   Steven M. Mager, Trial Attorney, Todd M. Hughes, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

OPINION AND ORDER

GEORGE W. MILLER, Judge.

   This matter is before the Court on plaintiffs' motion for preliminary injunction of September 22, 2006, and on defendant's motion to dismiss of October 13, 2006. Plaintiffs, Colorado Department of Human Services, Division of Vocational Rehabilitation ("Colorado DVR") and Mr. Steven Rightsell, move for a preliminary injunction requiring certain action by the Air Force that plaintiffs contend is necessary to maintain the status quo pending the decision of an arbitration panel convened pursuant to the Randolph-Sheppard Act, 20 U.S.C. § 107 *et. seq*. Defendant, United States ("Government"), moves to dismiss for lack of subject matter jurisdiction, arguing that plaintiffs have not exhausted their administrative remedies, plaintiffs lack standing, and the case is not ripe for review. In addition, defendant contends that even if

plaintiffs can satisfy the jurisdictional requirements, they have not demonstrated a substantial likelihood of success on the merits at arbitration.

The Court concludes that Congress has provided a specific and comprehensive scheme for administrative and judicial review of claims, such as those asserted by plaintiffs, alleging violations of the Randolph-Sheppard Act.  Under this scheme, a state licensing agency must pursue such claims before an arbitration panel followed by judicial review of the arbitration panel's decision as a final agency action for the purposes of chapter 7 of Title 5 of the United States Code, *i.e.*, section 10 of the Administrative Procedure Act ("APA"), as amended.  20 U.S.C. § 107d-2(a) (2000).  Because this Court lacks jurisdiction to review agency action under the APA, and in view of the specific and comprehensive statutory scheme established by Congress for resolving such claims, the Court GRANTS defendant's motion to dismiss for lack of subject matter jurisdiction, and directs the Clerk to enter judgment dismissing plaintiffs' complaint without prejudice.

### *BACKGROUND*

The Randolph-Sheppard Act as amended gives blind vendors a priority to operate vending facilities on federal property.  20 U.S.C. § 107(b).  By statute, the term "vending facility" includes "cafeterias."  *Id*. § 107e(7).  Under the Randolph-Sheppard regulatory scheme, federal agencies contract with state licensing agencies and the state agencies, in turn, identify and assign qualified blind vendors to operate the facilities.  34 C.F.R. § 395.33 (2006).

The following facts are uncontested unless otherwise noted.  In October of 1999, the Air Force awarded a contract under the Randolph-Sheppard program to Colorado DVR to operate the High Frontier Dining Facility ("cafeteria") at Buckley Air Force base ("Buckley") in Colorado.  Compl. ¶ 7.  Colorado DVR, in turn, assigned Mr. Steven Rightsell to operate the cafeteria in October of 2005.  Compl. ¶ 8.  During the time that plaintiffs operated the cafeteria, it was funded through appropriated funds as part of a meal plan.  D.'s Mot. at 3; Tr. of Oral Argument at 64–65, Oct. 26, 2006.  Only military personnel and select civilians with meal cards could purchase food at the cafeteria.  Henline Decl. at 1.  Military personnel were permitted to opt out of the meal plan and such individuals instead received a meal stipend they could use to purchase food wherever they chose.  Admin. R. at 86; Tr. of Oral Argument at 64–65.

In March of 2006, Colonel Oswaldo Mullins, Comptroller for the Air Force, issued a memorandum forecasting future budgetary reductions and directing all Air Force Space Command units, including Buckley,  to review their current contracting activity with a view toward reducing the amount of money that the Air Force was spending on contracting.  Admin. R. at 20–23.  In response to this directive, Buckley officials identified contracts which they determined would have the "least effect" on the Air Force's mission if eliminated.  Admin. R. at 86.  Overall, Buckley determined that it could reduce spending by $2.1 million by eliminating certain identified contracts, including the contract for the operation of the cafeteria which alone was projected to generate savings of $1.4 million.  Admin. R. at 86.  Accordingly, the Air Force

notified Colorado DVR by letter dated July 25, 2006, that it did not intend to exercise any further options under the cafeteria contract and that the contract would thus expire by its terms on September 30, 2006. Admin. R. at 79. The Air Force represented that the closing was "due to lack of funding and not because of any other reason." Admin. R. at 87.

Concurrent with its decision to allow the Colorado DVR contract to expire by its terms, the Air Force began to explore the idea of re-opening a dining facility in the same space using non-appropriated funds. Under the proposal, Air Force Services[1] would operate the facility on an "in-house" basis, *i.e.*, with government employees. Admin. R at 169. The Air Force conducted focus groups and explored various concepts for the proposed dining facility. Admin. R. at 147–53. The Air Force considered concepts ranging from a "casual dining" restaurant and bar to what was described as a "food court." Admin. R. at 32, 77, 94. The Air Force elected to proceed to the extent that it undertook planning to renovate the space and at one point estimated that the new facility would re-open on October 27, 2006.[2] Admin. R. at 92.

After discovering the plans to re-open the space, Colorado DVR contacted the Air Force, advising it that Colorado DVR sought to invoke its statutory priority in the operation of the facility. Admin. R. at 81. Colorado DVR indicated that it was amenable to the Air Force's proposed concepts and offered to operate what it understood to be a "sports bar" for the Air Force. Admin. R. at 81. Colorado DVR also indicated that it had available funds to assist the Air Force in paying for the facility renovations and for any necessary equipment. Admin. R. at 80–81. The Air Force responded to Colorado DVR's letter on September 18, 2006, advising it that the planned facility

> will not be a vending facility operation. This facility will be operated internally by the Services Division as a Nonappropriated Fund (NAF) activity and will not be

---

[1] Air Force Services is "a directorate under the Deputy Chief of Staff, Installations and Logistics (DCS/IL), Headquarters, U.S. Air Force." http://www-p.afsv.af.mil/ _AFSVA/About.htm. The types of services offered by Air Force Services range from the operation of libraries, fitness centers and bowling alleys to providing mortuary services. *Id.* "The Air Force is the only Service with trained personnel dedicated to delivering these services in a deployed environment." *Id.* Air Force Services is "funded with a combination of taxpayer dollars—appropriated funds (APFs) and self-generated, nonappropriated funds (NAFs)." *Id.*

[2] The Government now maintains that any plans to operate a new dining facility are still tentative. The Government contends that, despite its planned renovations, it is still considering various concepts and some of those concepts might not constitute a "cafeteria" under the Randolph-Sheppard Act. D.'s Mot. at 19. In view of the Court's ruling on the jurisdictional issue, the Court need not address the question whether the Air Force's plans were sufficiently final to make the plaintiffs' claims ripe for review, or whether the potential dining facilities described in the administrative record would constitute a "cafeteria" for purposes of the Randolph-Sheppard Act.

>contracted out. NAF dollars are those generated locally through user fees, program fees and other resale operations . . . . As this is not a contract operation or a vending facility within the meaning of the provisions of the Randolph-Sheppard Act, the priorities of the act do not apply.

Admin. R. at 169.

On September 20, 2006, Colorado DVR formally requested that the Department of Education ("DOE"), the agency responsible for administering the Randolph-Sheppard Act, institute an arbitration to determine the applicability of the Randolph-Sheppard Act to the proposed operation of the new dining facility. Attach. to Compl. Plaintiffs filed this "bid protest" action on September 22, 2006, requesting that the Court enter a preliminary injunction requiring the Air Force to take action allegedly necessary to maintain the status quo "until such time as the Randolph-Sheppard arbitration . . . is complete." Pls.' Mot. at 2. Plaintiffs request such a preliminary injunction because they allege that "Randolph-Sheppard arbitrations almost always take over a year to complete" and they further allege that without an injunction "Colorado DVR and Mr. Rightsell will be irreparably harmed" in the meantime. Pls.' Mot. ¶¶ 9, 10.

Plaintiffs' claims for arbitration are based upon: (1) the Air Force's alleged failure to accord the statutory priority required by the Randolph-Sheppard Act in favor of blind vendors, and (2) the Air Force's undertaking to renovate a federal building without providing space for a Randolph-Sheppard vending facility, allegedly in violation of 20 U.S.C. § 107a(d)(1). Pls.' Mem. in Supp. of Mot. for Prelim. Inj. at 6–11. On October 26, 2006, after hearing oral argument, the Court requested that plaintiffs submit proposed orders setting forth the precise terms of preliminary injunction they seek.[3]

On November 2, 2006, plaintiffs filed two alternative proposed orders. The first order would require the Air Force to complete the renovations in a timely manner and, when completed, install plaintiffs as the operators of the new facility. In the Court's view, such an order appears to go beyond preservation of the status quo pending the outcome of the arbitration. *See infra* pages 9–10. The second proposed order would enjoin the Air Force "from entering into or performing under any contract or other arrangement for food services (including, but not

---

[3] The Court additionally requested that the parties file supplemental briefs to discuss the potential significance of *Labat-Anderson, Inc. v. United States*, 346 F. Supp. 2d 145 (D.D.C. 2004), and *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570 (2005). Because neither of the parties cited to these cases in their briefs and the reasoning in these cases could bear upon whether plaintiffs in this case qualify as "interested parties" under 28 U.S.C. § 1491(b), *see infra* pages 6–7, 12–13, the Court wished to afford the parties an opportunity to discuss the significance of these cases. Plaintiffs filed their supplemental brief on November 2, 2006, and defendant filed its responsive supplemental brief on November 15, 2006. Because the Court concludes that it lacks subject matter jurisdiction on other grounds, the Court finds it unnecessary to resolve issues relating to the interpretation of § 1491(b)(1). *See infra* pages 12–13.

limited to, operating the facility 'in-house') at the building . . . that contained [the cafeteria] . . . unless and until the Air Force has applied the Randolph-Sheppard Act's priority to that contract or other arrangement."  The Court understands the intent of the second proposed order to be to require the Air Force to either cease its plans to renovate and re-open the dining facility, or to proceed as if the Randolph-Sheppard Act priority applied notwithstanding the Air Force's intention to operate the proposed facility on an in-house basis rather than pursuant to contract.  Under the second order, the Court understands that the Air Force would have the option to: (1) leave the space unoccupied, (2) negotiate a contract with Colorado DVR for the operation of the facility, 34 C.F.R. § 395.33(d), (3) formally solicit bids or offers for the operation of the facility and award the contract to Colorado DVR if it its proposal is judged to be in the competitive range, *id.* § 395.33(b), or (4) request the Secretary of the DOE to approve a "limitation" on the Randolph-Sheppard priority.  *See* 20 U.S.C. § 107 ("Any limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary . . . .").

The Government responded to plaintiffs' complaint and motion for preliminary injunction on October 13, 2006, and at the same time filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  On October 23, 2006, plaintiffs filed an opposition to the Government's motion to dismiss and a reply in support of their motion for preliminary injunction.

The Government contends that plaintiffs are required to exhaust their administrative remedies before filing suit and have not yet done so.  D.'s Mot. at 11–15.  The Government also argues that the plaintiffs lack standing as "interested parties" within the meaning of 28 U.S.C. § 1491(b)(1), the bid protest jurisdictional statute.  D.'s Mot. at 15–17.  The Government further argues that the case is not ripe for review because, until the Air Force finalizes its plans, it remains a possibility that the facility might fall outside the regulatory definition of a "cafeteria."  D.'s Mot. at 19.  With respect to the substance of the motion for preliminary injunction, the Government contends that plaintiffs have not demonstrated a substantial likelihood of success on the merits at arbitration.  D.'s Mot. 19–25.  To support this assertion the Government contends that the Randolph-Sheppard Act does not apply to the in-house operation of a cafeteria and again argues that plaintiffs cannot demonstrate that the new facility will constitute a "cafeteria" within the meaning of the Randolph-Sheppard Act.  D.'s Mot. 19–22.  Defendant further argues that plaintiffs have failed to demonstrate that they are entitled to a preliminary injunction because they have not shown that absent an injunction they would suffer irreparable harm, that the Government would suffer greater harm if the Court were to grant an injunction than the plaintiffs would suffer if the Court were to deny an injunction, and that the public interest favors denial of the injunction.  D.'s Mot. at 23–25.

*DISCUSSION*

1.   **Standard of Review**

All federal courts are courts of limited jurisdiction. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978); *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998). "Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452–53 (2004) (citing U.S. Const. art. III, § 1). "The jurisdiction of the Court of Federal Claims is prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *RHI Holdings*, 142 F.3d at 1461. Such consent to be sued "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). If at any time the Court, on motion or *sua sponte*, concludes that it lacks subject matter jurisdiction over a claim, it must dismiss the claim. RCFC 12(h)(3). When ruling on a motion to dismiss for lack of subject matter jurisdiction, "the allegations of the complaint should be construed favorably to the pleader, to the end that the court must accept as true the facts alleged in the complaint." *Gajic-Stajic v. United States*, 36 Fed. Cl. 422, 423 (1996) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Plaintiff carries the burden of establishing that jurisdiction exists, however, once subject matter jurisdiction has been brought into question. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

2.   **Jurisdiction of the Court of Federal Claims**

The United States Court of Federal Claims ("CFC") has jurisdiction over two broad categories of cases. Section 1491(a) of Title 28 provides that the Court has jurisdiction to hear claims for money damages "founded either on the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." This is the CFC's traditional jurisdiction under the Tucker Act. *See, e.g., United States v. Testan*, 424 U.S. 392, 398 (1976). In 1996, Congress amended the Tucker Act by enacting the Administrative Disputes Resolution Act ("ADRA"), Pub. L. 104-320, 110 Stat. 3870 (1996). The ADRA added § 1491(b), expanding the CFC's jurisdiction to include both pre-award and post-award "bid protest" cases.[4]  Such cases involve claims by an

> interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a

---

[4] The ADRA originally granted the CFC and the United States district courts concurrent jurisdiction to entertain pre-award and post-award bid protest cases; however, § 12(d) of the ADRA provided that jurisdiction in the district courts would expire on January 1, 2001, unless extended by Congress. Because Congress elected not to renew the § 1491(b) jurisdiction of the district courts, the CFC is now the exclusive judicial forum for bid protest actions.

proposed procurement. . . . [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

*Id.* § 1491(b).  Here, plaintiffs are requesting only equitable relief and are not seeking money damages under § 1491(a).  Thus, if the Court has jurisdiction over plaintiffs' claims it must be pursuant to § 1491(b)(1).

### 3. Randolph-Sheppard Act

Congress enacted the Randolph-Sheppard Act for the purposes of "providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting." 20 U.S.C. § 107(a).  In pursuit of this goal, Congress provided that federal agencies must generally permit blind vendors to operate vending facilities on federal property.  *Id.* § 107(b).  In particular, the Randolph-Sheppard Act requires that the Secretary of Education ("Secretary") prescribe regulations designed to assure that "wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility or facilities would not adversely affect the interests of the United States."  *Id.* § 107(b)(2).  Further, when authorizing the operation of vending facilities on federal property, agencies must afford "priority . . . to blind persons licensed by a State agency."  *Id.* § 107(b)(1).  As mentioned *supra* page 2, each state designates a state licensing agency which manages the Randolph-Sheppard program within the state.  Under the DOE implementing regulations, federal agencies enter contracts with the licensing agency, and the state licencing agency then identifies suitable blind individuals to operate the vending facilities.  34 C.F.R. § 395.33.

The Randolph-Sheppard Act also provides a specific and comprehensive scheme for the resolution of disputes between a federal agency and a state licensing agency involving alleged violations of the Act.  The state licensing agency must first submit a formal request for arbitration to the Secretary.  *Id.* § 107d-2(a).  The Secretary then orders that an arbitration panel convene and render a decision, which the Randolph-Sheppard Act requires be published in the Federal Register.  *Id*. § 107d-2(c).  The decision of the arbitration panel is then subject to judicial review as a final agency action under the APA.  *Id*. § 107d-2(a) (decision is "subject to appeal and review as a final agency action for purposes of chapter 7 of . . . Title 5").

### 4. **Exhaustion of Administrative Remedies**

As a general principle, it is a "long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."  *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938) (footnote omitted).  More specifically, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has held that a plaintiff alleging a violation of the Randolph-Sheppard Act must first exhaust its administrative remedies—*i.e.,* complete the arbitration process—before

a court can exercise jurisdiction over its substantive claims. *Kentucky, Educ. Cabinet, Dept. for the Blind v. United States*, 424 F.3d 1222 (Fed. Cir. 2005).

The *Kentucky* court, however, also held that arbitration is not required in every case that involves the Randolph-Sheppard Act. Rather, the court held that arbitration is only required for "claims that allege a violation" of the Randolph-Sheppard Act. *Kentucky*, 424 F.3d at 1227. The *Kentucky* court thus declined to adopt the trial court's more expansive reading of the exhaustion requirement, *i.e.*, that arbitration is required for all cases bearing a "reasonable nexus" to the Randolph-Sheppard Act. *Id.* at 1225.

> Arbitration . . . was not meant to cover every complaint by a state licensing agency concerning the procurement of vending services. Congress enacted the arbitration provisions to fill a gap in the existing statutory scheme, under which vendors and state licensing agencies could bring claims based on a breach of contract or a violation of other federal procurement provisions, but could not bring a claim arising under the RSA.

*Id*. at 1226. The Federal Circuit held that "common allegations such as a breach of contract or a violation of government procurement provisions" could be brought before the CFC without first submitting the claim to arbitration, provided that the plaintiff does not allege a violation of the Randolph-Sheppard Act. *Id.*

Another category of Randolph-Sheppard Act cases in which arbitration is unnecessary—and indeed unavailable—consists of cases in which a disappointed bidder who is *not* a blind vendor challenges the application of the Randolph-Sheppard priority to an awarded contract. *See Southfork Systems, Inc. v. United States*, 141 F.3d 1124 (Fed. Cir. 1998) (pre-ADRA); *see also NISH v. Rumsfeld,* 348 F.3d 1263 (10th Cir. 2003); *NISH v. Cohen*, 247 F.3d 197 (4th Cir. 2001). In these cases, the plaintiffs have no rights under the Randolph-Sheppard Act, and thus have no available administrative remedies to pursue. Naturally, in such a case the plaintiff may immediately bring whatever claims plaintiff does have before a court of competent jurisdiction. Nonetheless, in order to resolve the dispute, a court may necessarily be required to construe the Randolph-Sheppard Act. *See Rumsfeld,* 348 F.3d at 1269–70 (construing the term "cafeteria"); *Cohen*, 247 F.3d at 202–04 (same).

Even when exhaustion would normally be required, courts recognize three limited exceptions to the exhaustion rule. The first is when exhaustion of administrative remedies would be futile. *See, e.g., Etelson v. Office of Personnel Management*, 684 F.2d 918, 925 (D.C. Cir. 1982) (exhaustion not required because agency firmly entrenched in its position and committed not to change). The second exception is when the administrative remedies would be inadequate. *See, e.g., McCarthy v. Madigan,* 503 U.S. 140, 148–55 (1992). The third exception is when the plaintiff would suffer irreparable injury if forced to complete the administrative process. *See, e.g., McKart v. United States*, 395 U.S. 185, 197–01 (1969).

Here, plaintiffs do not argue that exhaustion is not required, nor do they argue that an exception applies. Rather, plaintiffs argue that the Court has the "incidental" power to issue a preliminary injunction maintaining the status quo, pending the outcome of the arbitration proceedings and that such power does not conflict with the exhaustion requirement. Pls.' Reply at 10–13. In *Randolph-Sheppard Vendors of America v. Weinberger,* 795 F.2d 90 (D.C. Cir. 1986), the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") discussed this incidental judicial power. In that case, the plaintiff initially sought judicial review on the merits of its claim that the Department of Defense violated the Randolph-Sheppard Act by awarding contracts to the Burger King Corporation and the McDonald's Corporation for the operation of fast food restaurants without affording priority to blind vendors. *Id*. at 92–93. At the trial level, the United States District Court for the District of Columbia exercised jurisdiction over the claims, finding that plaintiffs qualified under the futility exception to the exhaustion requirement. *Id.* The D.C. Circuit reversed, however, finding that plaintiffs did not qualify for any exceptions to the exhaustion requirement. *Id.* at 111. Although the D.C. Circuit dismissed the case for failure to exhaust the arbitration remedy, it endorsed the availability of a preliminary injunction pending the outcome of the arbitration proceedings, holding that "[i]nstead of seeking a decision on the merits, appellants should have sought a stay or an injunction against the contract awards pending arbitration."[5] *Id.* at 110 (citing *National Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 703 (D.C. Cir. 1974); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1305 (D.C. Cir. 1971); *Wheelabrator Corp. v. Chafee*, 455 F.2d 1306, 1316–17 (D.C. Cir. 1971)).

As indicated *supra* page 4, the first proposed order submitted by plaintiffs appears to go beyond "maintaining the status quo."[6] Because the cafeteria contract expired by its terms on

---

[5] As a technical matter, the incidental power described in *Weinberger* is not an "exception" to the exhaustion requirement. *See Jackson v. District of Columbia,* 254 F.3d 262, 268 (D.C. Cir. 2001) (holding that it is "unnecessary" for a court ruling on a motion for a preliminary injunction to maintain the status quo pending the completion of administrative proceedings to address whether an exception to the exhaustion requirement applies because the "Supreme Court has long recognized that federal courts possess a traditional power to issue injunctions to preserve the status quo while administrative proceedings are in progress and prevent impairment of the effective exercise of appellate jurisdiction."). This distinction is important because when a valid "exception" applies, a court may proceed to address the ultimate merits of the plaintiff's claims. *See, e.g., McKart*, 395 U.S. at 189–92; *Etelson*, 684 F.2d at 926–27. In contrast, when a plaintiff requests a preliminary injunction to maintain the status quo while the administrative proceedings run their course, the plaintiff must still pursue its administrative remedies.

[6] Moreover, the CFC will not order an agency to enter into a contract with a specific party. *Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1152 (Fed. Cir. 1994) ("[A] disappointed bidder has no right . . . to have the contract awarded to it in the event the . . . court

(continued...)

September 30, 2006, the status quo is that the cafeteria space is vacant and there is no contract for the operation of the cafeteria. Plaintiffs' second proposed order, *see supra* pages 4–5, appears to more closely approximate a request to maintain the status quo. In light of the Court's decision that it is without jurisdiction to grant a preliminary injunction pending the completion of arbitration proceedings required by the Randolph-Sheppard Act, the Court need not resolve the question whether either of the requested orders is appropriately tailored to preserve the status quo.

### 5. Jurisdiction to Enter a Preliminary Injunction Pending Arbitration

The power to enter a preliminary injunction pending the resolution of an administrative proceeding is "***merely incidental*** to the courts' jurisdiction to review final agency action, and has never been recognized in derogation of . . . a clear congressional purpose to oust judicial power . . . ." *Arrow Transp. Co. v. Southern Ry. Co.*, 372 U.S. 658, 671 n.22 (1963) (emphasis added). ***"[I]f a court may eventually have jurisdiction of the substantive claim***, the court's incidental equitable jurisdiction . . . gives the court authority to impose a temporary restraint in order to preserve the status quo pending ripening of the claim for judicial review." *Jackson v. District of Columbia,* 254 F.3d 262, 268 (D.C. Cir. 2001) (emphasis added) (quoting *Wagner v. Taylor*, 836 F.2d 566, 571 (D.C. Cir. 1987)). Thus, in order to grant the type of preliminary injunction that plaintiffs seek, this Court must "eventually" have jurisdiction over plaintiffs' substantive claims. Put another way, the Court must ask whether it will have jurisdiction to review the arbitration panel's decision at the conclusion of the arbitration proceedings.

The Court is not aware of any CFC or Federal Circuit authority that addresses this precise question. The only case that the Court is aware of in which the CFC exercised jurisdiction to hear a post-Randolph-Sheppard arbitration claim, *Texas State Commission for the Blind v. United States*, 6 Cl. Ct. 730 (1984), is distinguishable. In that case, the CFC exercised jurisdiction over plaintiff's claim for unpaid vending machine income that an arbitration panel had determined was owed to the blind vendor under the Randolph-Sheppard Act. *Id.* at 738–42 (construing 20 U.S.C. § 107d-3). This type of claim falls squarely within the CFC's traditional Tucker Act jurisdiction over claims for money damages. Although the arbitration panel's decision was ultimately brought into question, it was only as a result of the Government "defending against enforcement of the award on the ground that the award is not authorized by statute." *Tex. State Comm'n for the Blind v. United States,* 796 F.2d 400, 405 (Fed. Cir. 1986), *rev'g on other grounds* 6 Cl. Ct. 730, 735 (1984). In sum, *Texas State Commission* did not address the question presented here: whether state licensing agencies can obtain judicial review of an arbitration panel decision in the CFC. The Court concludes that they cannot.

---

[6](...continued)
finds illegality in the award of the contract." (quoting *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1575 (Fed. Cir. 1983)).

In the Randolph-Sheppard Act, Congress specifically provided for arbitration panels to hear claims alleging a violation of the Act, and it also provided that arbitration panel decisions were to be "subject to appeal and review as a final agency action for purposes of chapter 7 of . . . Title 5," *i.e.*, section 10 of the APA, as amended. 20 U.S.C. § 107d-2. The Federal Circuit, however, has held that the CFC "lacks APA jurisdiction."[7] *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (en banc). The Federal Circuit has suggested that jurisdiction under the Tucker Act in the CFC and jurisdiction in the district courts under the APA may not necessarily be mutually exclusive. *Ramcor Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1290 (Fed. Cir. 1999) ("Although a contractor may instead pursue a district court action under the APA . . . that remedy does not alter the jurisdiction of the Court of Federal Claims."). However, "[w]hen such a specific and comprehensive scheme for administrative and judicial review is provided by Congress, the Court of Federal Claims' Tucker Act jurisdiction over the subject matter covered by the scheme is preempted." *Vereda, Ltda. v. United States*, 271 F.3d 1367, 1375 (Fed. Cir. 2001); *St. Vincent's Med. Ctr. v. United States*, 32 F.3d 548, 549–50 (Fed. Cir. 1994); *see also United States v. Fausto*, 484 U.S. 439, 454–55 (1988); *Appalachian Reg'l Healthcare, Inc. v. United States*, 999 F.2d 1573, 1577 (Fed. Cir. 1993). To that end, the Federal Circuit has held that the Randolph-Sheppard Act contains a

> comprehensive scheme for the administration of disputes arising from violations of the [Randolph-Sheppard Act]. In the absence of a clear indication to the contrary, Congress's creation of a comprehensive remedial scheme is a strong indication that the scheme prescribed by statute was intended to be exclusive.

*Kentucky*, 424 F.3d at 1228 (citing *United States v. Babcock*, 250 U.S. 328, 331 (1919)). The Court thus lacks jurisdiction under both the APA and the Tucker Act to review an arbitration panel's decision and, as a consequence, lacks jurisdiction to entertain plaintiffs' motion for a preliminary injunction pending the outcome of the Randolph-Sheppard arbitration proceeding.

---

[7] Plaintiffs appear to misapprehend this Court's jurisdiction to hear cases brought under the APA. *See* Pls.' Reply at 12 ( "[The CFC] has statutory authority to issue injunctions under the Administrative Procedure Act." (citing § 1491(b)). Section 1491(b)(4) of Title 28 provides that "[i]n any action under this subsection, the courts shall review the agency's decision ***pursuant to the standards*** set forth in section 706 of title 5" (emphasis added). This language merely incorporates by reference the standard of review under the APA and does not grant the Court jurisdiction to review final agency action under the APA. *PGBA v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("[S]ection 1491(b)(4) only incorporates the arbitrary or capricious standard of review of section 706(2)(A)"). In contrast, the language of 20 U.S.C. § 107d-2 requires that Randolph-Sheppard arbitration panel decisions are "subject to ***appeal and review as a final agency action for purposes of chapter 7 of . . . Title 5***." (emphasis added). The Court concludes that this language requires that review of an arbitration panel decision not only apply the standard of review of the APA, but that such review actually be accomplished by means of an action for judicial review pursuant to the APA.

Even putting aside the doctrine that provision of a specific and comprehensive Congressional scheme for administrative and judicial review normally implies that the statutory scheme is exclusive and therefore displaces Tucker Act jurisdiction, it is not clear that this Court would have jurisdiction under the Tucker Act in any event.  The Court would certainly lack jurisdiction to hear plaintiffs' claims that the Air Force's renovation plans are inconsistent with the Randolph-Sheppard Act.  Put simply, those claims allege an improper renovation not an improper procurement.

The Court also questions whether it would have jurisdiction over plaintiffs' remaining claims that the Randolph-Sheppard Act requires the Air Force to afford Colorado DVR statutory priority for the operation of the planned facility notwithstanding the Air Force's intent to operate it on an in-house basis.  The Air Force does not contemplate issuing any solicitation or entering into any contracts for the operation of the facility.  D.'s Mot. at 4.  It is unclear whether under those circumstances either of the plaintiffs has standing as an "interested party."  There is arguably inconsistent authority on this issue within the CFC.  *Compare LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 575–76 (2005) (holding that a solicitation is not a jurisdictional requirement under § 1491(b)(1)) *with, e.g.*, *Fire-Trol Holdings, LLC v. United States*, 62 Fed. Cl. 440, 444–45 (2004) (holding that, at a minimum, an outstanding solicitation or request for offers is required in order for the CFC to exercise jurisdiction under § 1491(b)(1)).

Moreover, the Court questions whether a "procurement" exists in this case.  Plaintiffs do not challenge a "solicitation" or a "contract or . . . a proposed award or the award of a contract."  Hence, in order for this Court to have jurisdiction under § 1491(b)(1) plaintiffs must allege a "violation of statute or regulation in connection with a procurement or a proposed procurement."  The Court recognizes that the term "procurement" has been construed expansively.  *See, e.g., OTI America, Inc. v. United States*, 68 Fed. Cl. 108, 114 (2005) ("Congress has defined the term 'procurement' to include 'all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" (quoting 41 U.S.C. § 403)).  As a matter of statutory interpretation, however, the Court questions whether the term "procurement" can be read so expansively as to include a case in which a federal agency elects not to solicit bids or offers to enter into a contract and instead elects to perform an activity in-house.  Statutes must be read as a whole and effect must be given to the greatest extent possible to all portions of a statute.  *Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 60 (2004) ("Statutory construction is a 'holistic endeavor.'") (citing *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988); *United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 455 (1993); *Smith v. United States*, 508 U.S. 223, 233 (1993)).  The final sentence of § 1491(b)(1) provides that the "United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted ***before or after the contract is awarded***."  Arguably, this language envisions that a contract must at least be contemplated before this Court can exercise jurisdiction under § 1491(b)(1).  If the term "procurement" is construed in light of the final sentence of § 1491(b)(1), the existence of a contract—or at least a proposed contract—may be a jurisdictional requirement.

As indicated above, however, the Court decides it is without jurisdiction in this case because the Court lacks general APA jurisdiction and because the specific and comprehensive scheme provided by Congress preempts any Tucker Act jurisdiction that might otherwise exist. It is therefore unnecessary for the Court to resolve issues relating to whether either plaintiff is an "interested party" and whether § 1491(b)(1) extends to a case, such as this, where plaintiffs claim that the Government's decision not to contract for a particular service is a claim "objecting to . . . any alleged violation of statute or regulation in connection with a procurement or proposed procurement" within the meaning of § 1491(b)(1).[8]

## *CONCLUSION*

Congress has prescribed a specific and comprehensive scheme for the administrative and judicial review of claims alleging a violation of the Randolph-Sheppard Act. In particular, Congress has required plaintiffs alleging a violation of the Randolph-Sheppard Act to submit such claims to an arbitration panel convened by the Secretary of Education. The arbitration panel's decision is then subject to judicial review as a final agency action under the APA. Whereas, this Court does not possess general jurisdiction to review agency action under the APA, and may not exercise jurisdiction under the Tucker Act in circumvention of the specific and comprehensive scheme established by Congress for administrative and judicial review of claims alleging violations of the Randolph-Sheppard Act, this Court is without jurisdiction to hear plaintiffs' claims or grant plaintiffs' requested preliminary injunction pending the outcome of the arbitration panel's decision.[9]

For the reasons set forth above, defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is GRANTED. The Clerk is directed to enter judgment

---

[8] The Court is sensitive to the fact that, in this case, the very offense that plaintiffs complain of is the Government's failure to contract for vending services; however, the question is not *whether* plaintiffs may pursue their substantive claims, but rather *where* plaintiffs may pursue such claims.

[9] This opinion is not intended to affect this Court's recognized authority to hear cases involving the Randolph-Sheppard Act in which arbitration is not required pursuant to the reasoning in *Kentucky, Educ. Cabinet, Dept. for the Blind v. United States*, 424 F.3d 1222 (Fed. Cir. 2005), nor is this opinion intended to affect the Court's authority to hear claims for money damages alleged to be due as a result of a completed Randolph-Sheppard arbitration, such as was the case in *Texas State Commission for the Blind v. United States*, 6 Cl. Ct. 730 (1984).

dismissing plaintiffs' complaint without prejudice.  Plaintiffs' motion for preliminary injunction is DENIED as moot.

    IT IS SO ORDERED.

                                                s/ George W. Miller  
                                                GEORGE W. MILLER  
                                                Judge